John J. Walsh, J.
Before permitting the prosecution to proceed further with testimony as to gunpowder residue, the court feels that it should consider the admissibility of such evidence being offered now before allowing the parties to proceed.
Forensic science has in the past been faced with the problem of determining whether or not a suspect has fired a weapon. The diphenylamine test on paraffin lifts from the hands has been found to be scientifically unreliable for determining whether a person actually has fired a weapon. Most courts in the past have excluded such tests as having little probative value in criminal cases.
A new technique called “ neutron activation analysis ” has been developed which has been defined as “a method of elemental analysis based upon the production of radioisotopes in the sample to be analyzed, by nuclear reactions induced by neutron bombardment, followed by the identification and quantitative measurement of the different radioisotopes formed.” (See Vincent P. Guinn, Non-bio logical Applications of Neutron Activation Analysis in Forensic Studies, in Methods of Forensic Science, Interscience Publishers, England [1964], vol. 3.)
This analysis is now being widely used to determine gunpowder residues, bullet residues, the composition of metals, alloys, drugs, soils, fibers, plastic tapes, concrete, rubber, ink, paper, paint and other materials.
Insofar as it is used in connection with gunpowder residue, the F. B. I. Law Enforcement Bulletin, September, 1970 states: “ The elements, antimony and barium, which are found in most primer mixtures for ammunition, have been found in the majority of times to contaminate the hand of a shooter after the firing of a weapon. Generally, cartridges are ignited when a firing pin falls on a primer and in turn ignites the smokeless powder charge in the cartridge. The escaping gases can deposit antimony and barium from the primer on the shooting hand in amounts normally so small that their presence cannot be detected by ordinary techniques. Employing neutron activation analysis, one can positively identify these elements and measure their amounts.”
In the case on trial, Special Agent James Shebesta of the Treasury Department Firearms Enforcement Unit has testified that on March 19, 1972 he went to Camden, New York at the request of the New York State Police and took swabbings of the *772 back of the right hand, the palm of the right hand, the back of the left hand and the palm of the left hand of the defendant and sent the samples to the laboratory at Washington. He testified that after first washing his own hands so as not to contaminate the samples, the swabs were covered with a solution consisting of 5% ammonium nitrate and 95% water. He then took the individual samples and sent them together with the remnants of the Q-tips as a control to the laboratory.
Apparently, the theory of the experiment is that these rinsings or swabbings of the “thumb-web ” and back of the hand when subjected to nuclear bombardment will detect small but clearly measureable amounts of antimony and barium from a single firing of a gun.
While we have been able to find no New York case which specifically has passed upon the admissibility of such evidence, there seems to be evidence that it has been accepted by the Federal courts as meeting the tests of reliability and admissibility.
(United States v. Stifel, Dist. Ct., N. D. Ohio, April, 1969, aifd. 433 F. 2d 431 [6th Cir.], cert. den. 401 IT. S. 994 [March 29,1971] [bomb debris] ; State of Missouri v. Stephens, Cir. Ct., St. Lewis County, Mo., Nov. 1,1969, affd. 467 S. W. 2d 10 [1971], cert. den. 404 U. S. 994 [hair and thread samples]; State v. Goolidge, Super. Ct., N. H., May, 1965, affd. 109 N. H. 403 [1969], rev. on other grounds 403 U. S. 443, rehearing den. 404 TJ. S. 874 [organic and inorganic particles].)
While such evidence is admissible, the F. B. I. Enforcement Bulletin, September, 1970 points out the obvious limitations which such testimony has: “If antimony and barium are f ound as contaminants on a paraffin lift from the hand of a subject, it cannot be absolutely stated that the subject has fired a weapon; it will be concluded that the residue present on the lift is typical and characteristic of that residue which contaminates a shooter’s hand subsequent to the discharge of a firearm. An individual who has handled a weapon or cartridge case which was recently fired could logically contaminate his hands with primer residue.”