**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2356-18

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

KEVIN MILLER, a/k/a
IBN MILLER,

    Defendant-Appellant.

_____

Submitted May 3, 2021 – Decided July 19, 2021

Before Judges Sabatino and Currier.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 16-04-1284.

Joseph E. Krakora, Public Defender, attorney for appellant (Marcia Blum, Assistant Deputy Public Defender, of counsel and on the briefs).

Theodore N. Stephens II, Acting Essex County Prosecutor, attorney for respondent (Frank J. Ducoat, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

After a ten-day jury trial, defendant Kevin Miller was found guilty of felony murder, two simultaneous robberies, and other offenses. He now appeals his conviction and sentence.

The State's proofs showed that after 2:00 a.m. on the morning of June 20, 2015, the two victims, Shakime Peppers and his cousin Radee Foye, were sitting on the stoop of Peppers' residence in Newark. Two men, one of whom was later identified by Foye as defendant and another man who was never positively identified, approached the cousins and demanded their belongings. Both men were pointing guns.

Foye handed over money and his cellular phone to the robbers. The other victim, Peppers, heard something and asked "What?" In response, one of the robbers attempted to fire his gun, but it malfunctioned and "went click." Both Peppers and Foye ran away in different directions. Peppers was chased by the robbers. Moments later Foye heard a gunshot, and when he returned, he saw Peppers had been killed by that gunfire.

There were no eyewitnesses to the crimes other than Foye, although a video recorded from an exterior surveillance camera showed Foye and Peppers coming and going from the location. The video is not clear enough to identify the robbers. A shell casing was recovered near the scene and ballistics matched

2

it to a gun later found in the possession of a third party. No DNA or fingerprint evidence forensically established the identity of the two robbers, or which one of them had shot and killed Peppers.

Shortly after the robberies and shooting, Foye gave a recorded statement to the police, in which he detailed what had occurred. In that recorded statement, Foye positively identified defendant, who he called "Manny," as one of the robbers. Foye did not make an identification of the other perpetrator, other than to describe that person's clothing and appearance.

When he was called by the prosecution as a witness at trial, Foye refused to give a detailed account of the incident and declined to identify defendant saying that he couldn't remember the events because he was intoxicated. However, after a Gross[1] hearing, at which the trial court found Foye's recorded statement "reliable," the recorded statement was admitted and played for the jury. The court also admitted into evidence, after a Miranda[2] hearing, defendant's police interrogation, in which he generally denied wrongdoing.

---

[1] See State v. Gross, 121 N.J. 1, 15-17 (1990) (adopting a multi-factor test for the admission of a trial witness's sworn prior inconsistent statements).

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

Defendant did not testify on his own behalf at trial. The tenor of his defense was focused on discrediting the evidence presented by the prosecution. Trial counsel argued defendant had an alibi and had not been near the scene of the crime. The defense further asserted that Foye's inculpatory recorded identification was made while intoxicated and under improper influence by his family and friends.

Following the jury's guilty verdict, the trial court sentenced defendant on the felony murder count to a thirty-year prison term subject to an eighty-five percent parole disqualifier under the No Early Release Act ("NERA"), N.J.S.A. 2C:43-7.2, consecutive to a fifteen-year NERA sentence on one of the robberies.[3]

In this direct appeal, defendant raises a variety of arguments concerning trial and sentencing issues:

POINT I

IT WAS REVERSIBLE ERROR FOR THE COURT TO FAIL TO GRANT A MISTRIAL WHEN THE PROSECUTOR ELICITED TESTIMONY FROM TWO WITNESSES THAT DEFENDANT WAS IN

---

[3] The judgment of conviction also imposed a consecutive eight-year sentence on Count 5 for possession of a weapon for an unlawful purpose, but the parties agree that, based on the court's oral ruling in the transcript, this particular component of the sentence should be made concurrent to other counts.

JAIL, AND THE PREJUDICE WAS ONLY EXACERBATED BY THE COURT'S BELATED AND FLAWED CURATIVE INSTRUCTION.

A.    TELLING THE JURY THE DEFENDANT IS IN JAIL VIOLATES THE PRESUMPTION OF INNOCENCE.

B.    THE PROSECUTOR GETS QUADERRAH STARKS TO SAY THAT MILLER IS IN JAIL.

C.    THE PROSECUTOR GETS SHAQUANAH STARKS TO SAY THAT MILLER IS IN JAIL.

D.    THE ERRORS WERE BEYOND CURE BY AN INSTRUCTION, AND THE BELATED AND MISGUIDED INSTRUCTION THE COURT DELIVERED EXACERBATED THE PREJUDICE.

E.    THE TESTIMONY FROM TWO WITNESSES INFORMING THE JURY THAT DEFENDANT WAS IN JAIL WAS HARMFUL ERROR.

POINT II

IT WAS REVERSIBLE ERROR FOR THE PROSECUTOR TO REPEATEDLY CHARGE THAT DEFENDANT AND TWO WITNESSES WERE "LIARS" AND TO ASSURE THE JURY THAT A POLICE WITNESS WAS "HONEST AND TRUTHFUL."

POINT III

BOTH ROBBERIES MUST MERGE WITH THE FELONY MURDER BECAUSE THE JURY WAS INSTRUCTED THAT IT COULD NOT CONVICT OF FELONY MURDER UNLESS IT FOUND THAT THE

A-2356-18

MURDER OCCURRED DURING THE COMMISSION OF BOTH ROBBERIES; AT A MINIMUM, THE SENTENCES ON THE FELONY MURDER AND THE NON-MERGED ROBBERY MUST BE CONCURRENT.

A.    PREDICATE FELONIES MERGE WITH THE FELONY MURDER.

B.    BOTH ROBBERIES MERGE WITH THE FELONY MURDER BECAUSE THE JURY WAS TOLD THAT IT COULD NOT CONVICT OF FELONY MURDER UNLESS IT FOUND BEYOND A REASONABLE [DOUBT] THAT THE MURDER WAS COMMITTED IN THE COURSE OF BOTH ROBBERIES

C.    THE RULE IN STATE V. HILL IS INAPPLICABLE ON THESE UNIQUE FACTS.

D.    IF THE COURT DOES NOT MERGE BOTH ROBBERIES WITH THE FELONY MURDER, IT MUST RUN THE SENTENCES ON THE UNMERGED ROBBERY AND THE FELONY MURDER CONCURRENTLY.

POINT IV

THE SENTENCES FOR THE FELONY MURDER AND THE NON-MERGED PREDICATE FELONY SHOULD BE CONCURRENT.

POINT V

THE COURT ORDERED THE SENTENCE ON COUNT 5 TO RUN CONCURRENTLY TO THE OTHER SENTENCES. THE AMENDED JUDGMENT OF CONVICTION MISTAKENLY RECORDS THE

6

SENTENCE ON COUNT 5 AS RUNNING CONSECUTIVELY TO THE OTHER SENTENCES, AND MUST BE CORRECTED TO STATE THAT IT IS CONCURRENT.

In a supplemental brief, defendant raises this additional sentencing point:

POINT VI

THE LAW REQUIRING SENTENCING MITIGATION FOR YOUTHFUL DEFENDANTS DEMANDS RETROACTIVE APPLICATION BECAUSE THE LEGISLATURE INTENDED IT; THE NEW LAW IS AMELIORATIVE IN NATURE; THE SAVINGS STATUTE IS INAPPLICABLE; AND FUNDAMENTAL FAIRNESS MANDATES IT.

A. THE LEGISLATURE INTENDED RETROACTIVE APPLICATION.

B. THE NEW MITIGATING FACTOR IS AMELIORATIVE.

C. THE SAVINGS STATUTE DOES NOT PRECLUDE RETROACTIVE APPLICATION OF THIS AMELIORATIVE RETROACTIVE STATUTE.

D. RETROACTIVE APPLICATION OF THE MITIGATING FACTOR IS REQUIRED AS A MATTER OF FUNDAMENTAL FAIRNESS AND TO EFFECTUATE THE REMEDIAL PURPOSE OF THE SENTENCING COMMISSION'S EFFORTS REGARDING JUVENILE SENTENCING.

Having considered these arguments, we affirm defendant's conviction and sentence, except we remand to the trial court to implement the agreed-upon

7

modification of the sentence on Count 5 from a consecutive term to a concurrent term.

## I.

We first address defendant's contentions that he should have been granted a mistrial because two witnesses called by the State, Quaderrah Starks and her sister Shaquanah Starks,[4] revealed to the jurors that defendant was incarcerated before trial.

Defendant had been dating Shaquanah. The sisters shared a cell phone. During their direct examination by the prosecutor, they were each asked if they had recently spoken with defendant, in an apparent effort to show their bias in favor of him. Despite being asked a series of "yes" or "no" questions, both sisters blurted out that they could not call defendant because he was in jail.

Defense counsel requested a mistrial after both of the sisters' statements, which the trial judge denied. The judge did provide a curative instruction within the final charge days later, telling the jurors it is common that people charged with crimes are held in jail pending trial, and that they should disregard that fact in deciding whether defendant was guilty.

---

[4] We refer to the two Starks sisters by their first names for clarity, but intend no disrespect.

The parties did stipulate, and the jurors were told, that the sisters' shared phone reflected forty or more calls with defendant during the time period leading up to the trial (as the prosecutor was trying to elicit). The instruction on those stipulated facts also informed the jury that during those phone calls the sisters discussed the case with defendant, although he did not tell them how to testify. The instruction did not disclose that the calls were on a recorded prison phone line.

As eventually clarified by the trial judge, he found the prosecutor's questioning of the sisters, which had revealed defendant's jail status, was "not orchestrated" to elicit the challenged testimony. The prosecutor said nothing about defendant's incarceration in closing argument.

On appeal, defendant argues the sisters' revelation of his jail status to the jury was an egregious error that compels a new trial, and that the court's delayed curative instructions were manifestly inadequate. We disagree.

Several general principles guide our review of this issue. It has long been held that mistrials are to be ordered with the "greatest caution." State v. Witte, 13 N.J. 598, 611 (1953). Thus, a mistrial should only be granted when evidentiary errors during trial cannot be ameliorated by curative instructions. State v. Winter, 96 N.J. 640, 647 (1984). A jury is generally presumed to be

"capable of following a curative instruction to ignore prejudicial matter." Williams v. James, 113 N.J. 619, 632 (1989); see also State v. Herbert, 457 N.J. Super. 490, 503-08 (App. Div. 2019) (recognizing the "abundant" authority that courts presume juries will follow instructions, albeit also recognizing that instructions may be inadequate to cure prejudice in some situations).

"[A]n appellate court will not disturb a trial court's ruling on a motion for a mistrial, absent an abuse of discretion that results in a manifest injustice." State v. Harvey, 151 N.J. 117, 205 (1997) (citing State v. DiRienzo, 53 N.J. 360, 383 (1969)); see also State v. Smith, 224 N.J. 36, 47 (2016) (citing Harvey for the same proposition); R. 3:20-1. Evidentiary errors that prompted an unsuccessful motion for a mistrial should be disregarded unless they were "clearly capable of producing an unjust result." Winter, 96 N.J. at 648; see also R. 2:10-1. Where, as here, multiple errors are alleged, "the predicate for relief for cumulative error must be that the probable effect of the cumulative error was to render the underlying trial unfair." State v. Wakefield, 190 N.J. 397, 538 (2007).

The decision as to whether curative instructions will be sufficient in curing the introduction of inadmissible evidence is "peculiarly within the competence of the trial judge . . . . " Winter, 96 N.J. at 646-47. A reviewing

court should give "equal deference to the determination of the trial court" when weighing the effectiveness of curative instructions issued by the trial judge. Ibid.

Here, defendant's requests for a mistrial emanated out of the potential prejudice to him caused by the jury learning from the testimony of the Starks sisters that he had been in jail—for some unspecified reason at some point in time—before the present trial commenced. In this regard, defendant compares his circumstances to cases in which a jury had observed a defendant in the courtroom bound by handcuffs or wearing prison garb.

Our laws disfavor placing physical restraints on criminal defendants when they appear at trial, because the restraints may suggest to the jury they are dangerous persons who are not to be trusted, "even under the surveillance of officers." State v. Artwell, 177 N.J. 526, 534 (2003). Similarly, when a criminal defendant appears in court in prison clothes, his or her appearance as an apparent wrongdoer may prejudicially affect the jury's judgment. Ibid.; see also Estelle v. Williams, 425 U.S. 501, 503-04 (1976) (holding that when a defendant appears in his prison clothes, his or her right to a fair trial and the presumption of innocence under the Fourteenth Amendment of the United States Constitution may be implicated).

The same concerns about undue prejudice flow from the admission of "other crimes" evidence under N.J.R.E. 404(b).  On some occasions, evidence of a defendant's previous incarceration or commission of crimes "poses a distinct risk that it will distract a jury from an independent consideration of the evidence that bears directly on guilt itself."  State v. G.S., 145 N.J. 460, 468 (1996).

Defendant cites in this regard to State v. Reddish, 181 N.J. 553, 609-10 (2004), in which a jury learned of a defendant's incarceration for another offense and the Supreme Court reversed his murder conviction based on the prejudice that revelation could have on the jury.  In Reddish, however, the potential for prejudice was much more significant than in the present case.

In Reddish, police interrogated the defendant after a television broadcast showed he was in custody for killing his girlfriend in Burlington County.  Id. at 606-07.  While in custody for the separate murder charge, the defendant confessed to investigators from Cherry Hill that he had killed the victim, for which he was suspected years earlier.  He later stated the same to a news reporter.  The jury was told at trial that the defendant's girlfriend was deceased, and that he was in custody for "an unrelated charge" when he confessed to the murder. No specific reference was made to the nature of that "unrelated charge." Id. at 607-10.  In summations, however, the prosecutor argued that because the

defendant was in custody for the unrelated charge, he "had reached the end of the line.  He couldn't hide from the truth any longer and he couldn't hide the truth any longer."  Id. at 607-08.  The Supreme Court explained that, in culmination, "the risk, if not the likelihood, that a jury would infer that defendant was in custody for another murder foreseeably outweighed the marginal probative value of the custodial nature of his confession."  Id. at 610.

The circumstances of this case are not as prejudicial.  The references to defendant's incarceration were fleeting, and the details were scant.  See Jackowitz v. Lang, 408 N.J. Super. 495, 505 (App. Div. 2009) (noting that "[f]leeting comments, even if improper, may not warrant a new trial, particularly when the verdict is fair"); see also Herbert, 457 N.J. Super. at 508.  All that the jury heard from the Starks sisters was that defendant was in "County" (meaning the County jail) and that he was "incarcerated," without elaboration or specifying that he had committed a separate crime.  These glancing references, which were quickly objected to by defense counsel before any further elaboration, were not pervasive or sustained.  The situation was not comparable to one in which the jurors continuously gazed upon a defendant in the courtroom wearing shackles or a prison jump suit, nor are they similar to the scenario in Reddish.

The curative instruction issued by the trial judge here dispassionately explained that it is not uncommon for a person being charged with a crime to be held in jail before his or her case is tried. The instruction stressed that defendant must be presumed under the law to be innocent. It appropriately admonished the jurors to not draw any adverse inference against him just because he had been in jail when the sisters had contact with him. Defense counsel ultimately agreed to include the admonition proposed by the prosecution after the wording was discussed on the record. As we have already noted, the prosecutor did not try to take advantage of the revelation during closing argument. There was no reference to any other crimes defendant had been previously charged with or committed.

We are mindful that, ideally, curative instructions should be issued promptly. See State v. Vallejo, 198 N.J. 122, 134-35 (2009). We recognize the judge in this case did not issue the curative instruction immediately after the sisters' testimony but issued it days later. Even so, we are unpersuaded the instruction was ineffectual, or that the blurted-out words of the sisters were so pernicious as to deprive defendant of a fair trial.

In sum, the fleeting references did not have the clear capacity to deprive defendant of a fair trial, Rule 2:10-2, and the court did not abuse its discretion in rejecting the drastic measure of a mistrial.

II.

For the first time on appeal, defendant alleges the prosecutor's closing argument was unduly prejudicial by virtue of his comments referring to defendant and defense witnesses as "liars," while, on the other hand, describing one of the responding detectives as an "honest" witness.

Because this argument was not raised below by defendant's trial attorney, we consider it through the prism of a "plain error" standard of review. R. 2:10-2. Not only must defendant show the admission of the prosecutor's comments was error, but he must further demonstrate that the possibility of injustice flowing from the comments is "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." State v. Macon, 57 N.J. 325, 336 (1971); see also State v. Prall, 231 N.J. 567, 581 (2018) (citing Macon for the same point). Defendant fails to establish such reversible plain error.

As the Supreme Court reiterated a few months ago in State v. Williams, 244 N.J. 592 (2021), "the fundamental obligation of those representing the State

in criminal prosecutions is not to convict, 'but to see that justice is done.'" Id. at 607 (quoting State v. Frost, 158 N.J. 76, 83 (1999)). Nonetheless, the prosecution's duty to achieve justice does not forbid a prosecutor from presenting the State's case in a "vigorous and forceful" manner. State v. Ramseur, 106 N.J. 123, 288 (1987); see also State v. Smith, 167 N.J. 158, 177 (2001). Criminal trials often create a "'charged atmosphere . . . [that] frequently makes it arduous for the prosecuting attorney to stay within the orbit of strict propriety.'" Ibid. (quoting State v. Bucanis, 26 N.J. 45, 56 (1958)).

Although "prosecutors in criminal cases are expected to make vigorous and forceful closing arguments to juries" and are "afforded considerable leeway," "their comments [should be] reasonably related to the scope of the evidence presented." Williams, 244 N.J. at 607 (alterations in original) (quoting Frost, 158 N.J. at 82). "[A]s long as the prosecutor stays within the evidence and the legitimate inferences therefrom, . . . [t]here is no error." Id. at 608 (internal citations omitted).

As a general rule, it "is improper for a prosecutor to express his personal opinion on the veracity of any witness." State v. Rivera, 437 N.J. Super. 434, 463 (App. Div. 2014) (citing State v. Marshall, 123 N.J. 1, 154 (1991)). However, not all such expressions of opinion are so inherently prejudicial to

16

require a new trial. If defense counsel does not object contemporaneously to the prosecutor's comments, "the reviewing court may infer that counsel did not consider the remarks to be inappropriate." State v. Vasquez, 265 N.J. Super. 528, 560 (App. Div. 1993) (citing State v. Johnson, 31 N.J. 489, 511 (1960)); see also Frost, 158 N.J. at 83 ("[g]enerally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial"); State v. Kane, 449 N.J. Super. 119, 141 (App. Div. 2017) (same).

Here, the allegedly improper statements of opinion by the prosecutor were substantially supported by the video recorded evidence that was played for the jury. The State's case largely focused on showing how the assertions of defendant in his police statement and the trial testimony of the defense witnesses were contradicted by other evidence. The prosecutor highlighted those contradictions by playing the video recordings and contrasting them with the defense assertions. In large measure, the prosecutor had a substantiated basis to support his argument to the jury that the defense witnesses had lied.

For instance, although Shaquanah and Quaderrah both denied they had contact with defendant before trial, the State produced prison call logs showing that such contact had indeed occurred, causing the defense to stipulate to that fact. Similarly, although defendant told the police he had arrived home in a

"classic cab" the night of the incident, the prosecutor countered with evidence of a statement by Shaquanah that he had arrived home with friends in a "black Jeep."

The prosecutor spotlighted for the jurors these and other inconsistencies during his closing argument, reasonably arguing the inconsistencies showed defendant and his witnesses had been untruthful in various respects.

The prosecutor's comments advocating, by comparison, the credibility of the police detective also did not deprive defendant of a fair trial. The prosecutor's assertion that the detective was honest and truthful was, at least in part, a justified attempt to deal with the detective's mistaken view of the law, i.e., that Peppers was not a robbery victim because he never actually had anything taken from him. The prosecutor was permissibly arguing to the jurors—within the fair bounds of advocacy—that they should not treat the detective's misunderstanding about Peppers' legal status as being tantamount to intentional lying. The detective's misapprehension was fairly characterized in the State's summation as an "honest" mistake. There was no objection to this, and no manifest injustice in allowing the jurors, having heard the lawyer's argument, to form their own judgments about the detective's veracity.

18

In sum, there is no reason to set aside this verdict because of the prosecutor's unobjected-to closing argument.

III.

Finally, we consider defendant's arguments concerning his sentence. In assessing these arguments, we apply well settled principles that afford considerable deference to sentencing judges.

As a general proposition, appellate courts may not substitute their judgment for that of the sentencing court, unless the application of the sentencing guidelines to the facts makes the sentence "clearly unreasonable so as to shock the judicial conscience." State v. Roth, 95 N.J. 334, 365 (1984); see also State v. Liepe, 239 N.J. 359, 370 (2019) (citing Roth). "[W]hen [trial judges] exercise discretion in accordance with the principles set forth in the Code [of Criminal Justice] and defined by [the Court] . . . , they need fear no second-guessing.'" State v. Bieniek, 200 N.J. 601, 607-08 (2010) (quoting State v. Ghertler, 114 N.J. 383, 384-85 (1989)). Once the trial court has balanced the aggravating and mitigating sentencing factors set forth in N.J.S.A. 2C:44-1(a) and -1(b), it "may impose a term within the permissible range for the offense." Id. at 608; see also State v. Case, 220 N.J. 49, 54 (2014); State v. Fuentes, 217 N.J. 57, 70-71 (2014).

Mindful of these principles, we turn to defendant's specific claims of sentencing error.

Defendant initially argues that both of the underlying robberies are required to merge with the felony murder, because the jury was charged that to find defendant guilty of felony murder the jury must find "the defendant was engaged in the commission of . . . the crime of <u>robbery, as charged in Counts 2 and 4 of the indictment</u>." (Emphasis added). He further points out that the prosecution had argued to the jury with regard to the felony murder count that the jury must find that "in the course of the <u>theft or the attempted theft</u> of Shakime Peppers <u>and</u> Radee Foye or immediate flight thereafter, the victim was shot . . . ." (Emphasis added).

As a general proposition, "[w]hen the same conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for <u>each</u> such offense." N.J.S.A. 2C:1-8(a) (emphasis added). Merger at sentencing is required under N.J.S.A. 2C:1-8(a)(1) when one proven offense is a lesser-included offense of another. Our courts determine whether two charges should merge at sentencing by looking to:

> [T]he time and place of each purported violation[,] whether the proof submitted as to one count of the indictment would be <u>a necessary ingredient to a conviction under another count</u>[,] whether one act was

A-2356-18

>an integral part of a larger scheme or episode[,] the intent of the accused[,] and the consequences of the criminal standards transgressed.
>
>[State v. Davis, 68 N.J. 69, 81 (1975) (emphasis added).]

These factors are "attended by considerations of 'fairness and fulfillment of reasonable expectations in light of the constitutional and common law goals.'" Ibid. (quoting State v. Currie, 41 N.J. 531, 539 (1964)).

Generally, in determining whether to merge a defendant's convictions, the court will follow a flexible approach that focuses on the elements of the crime and the Legislature's intent in creating them. State v. Tate, 216 N.J. 300, 306 (2013) (citing State v. Hill, 182 N.J. 532, 542 (2005)). "Convictions for lesser-included offenses, offenses that are a necessary component of the commission of another offense, or that merely offer an alternative basis for punishing the same criminal conduct will merge." Ibid. However, when there is only one death, there can only be one conviction for felony murder. State v. Manning, 234 N.J. Super. 147, 164 (1989). A second underlying felony conviction, even without the accompanying murder charge, does not need to be disregarded for sentencing purposes. Ibid.

In Hill, 182 N.J. 532, the Supreme Court considered the context of merging at sentencing multiple predicate offenses into a felony murder count.

In that case, a defendant was found guilty of multiple predicate offenses to felony murder. We held that because a special verdict sheet was not used pursuant to Rule 3:19–1(b), all of the predicate offenses merged into the felony murder. The Supreme Court rejected that reasoning and reversed our disposition, remanding the case for resentencing. Id. at 540.

The Court noted in Hill that "[i]nasmuch as the crime of felony murder requires a predicate crime, when more than one predicate felony is found by the jury[,] the question becomes whether, and to what extent, one or more of such predicate crimes merges into the felony murder conviction for sentencing purposes." Id. at 541.

> Our review of this jurisprudence leads us to conclude that, in the context of felony murder considerations, the best course is to simplify the merger determination. We therefore hold that there is a "compelling need for the use of special verdict [forms]," [State v. Diaz, 144 N.J. 628, 644 (1996)], under Rule 3:19–1(b) for the jury to designate which felony or felonies constitute the predicate crime for a felony murder conviction. If the jury designates more than one felony as the predicate for felony murder, the trial court at sentencing is to merge only the predicate felony that set in motion the chain of events leading to the murder—the "first-in-time" predicate felony—into the felony murder conviction.
>
> [Id. at 548 (emphasis added).]

In adopting its first-in-time principle, the Court did not address in <u>Hill</u> a situation of two simultaneous predicate felonies, which is the context here. Even so, there appears to be no logical necessity to have both robberies merge into the felony murder.

Defendant would have us follow the analysis in <u>State v. Diaz</u>, 144 N.J. 628 (1996), in which the Supreme Court suggested that the reviewing court look to the summations of the prosecution and the jury instructions to determine whether the charges merge. However, the <u>Diaz</u> opinion was issued before <u>Hill</u>, which did not focus on the summations.

The wording of the jury instructions in this case does not clearly mandate the merger of both robberies into the felony murder, as advocated by defendant. The pertinent language used in the jury instructions, i.e., "as charged in Counts 2 and 4," is not inclusive, but rather is exemplary. It is not verbiage that requires both Counts to be found to be the predicate crimes for felony murder. It instead reasonably conveys, consistent with the law, that either robbery count alone could be sufficient to serve as the predicate felony.

The verdict sheet itself, albeit not a special verdict sheet, lists Count 2 (the robbery of Shakime Peppers) before Count 3 (felony murder), followed by Count 4 (the robbery of Radee Foye). That sequence clearly tracks the order of

the counts in the indictment. It logically suggests that the robbery of Peppers (Count 2) should be the one to merge with felony murder. The other robbery of Foye, as embodied in Count 4, need not merge.

Defendant also contests the trial court's imposition of consecutive sentences. As a preliminary matter, both parties do agree this case must be remanded for the Judgment of Conviction to reflect that the court actually imposed a concurrent sentence as to Count 5, not a consecutive sentence.

Assuming, as we have held above, the robbery of Foye does not merge into the felony murder, we must consider whether that robbery count should run concurrently or consecutively to the felony murder count. Defendant argues the trial court's analysis in imposing a consecutive term for the robbery was tantamount to imputing a higher degree of murder and criminal intent upon him that was not based on the evidence in the record. We disagree.

In State v. Yarbough, 100 N.J. 627 (1985), our Supreme Court identified the relevant criteria for determining when consecutive, as opposed to concurrent, sentences should be imposed. The Court noted that it is "senseless" to fashion sentences that essentially allow "free" crimes. Id. at 639. Instead, a sentencing court should consider the factual content of the crimes, including whether or not: (1) the crimes and their objectives were predominantly

independent of each other; (2) the crimes involved separate acts of violence or threats of violence; (3) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior; (4) any of the crimes involved multiple victims; and (5) the convictions for which the sentences were imposed were numerous. Id. at 643-44. These five factors are to be applied qualitatively, rather than quantitatively.

In this case, the trial judge balanced the mitigating and aggravating factors under N.J.S.A. 2C:44-1(a) and -1(b). He found that aggravating factors -1(a)(3), (6) and (9) apply and outweighed any mitigating factors. The trial judge expressed sound reasons for his sentencing decisions on the record, and considered defendant's claims of mitigating factors, including the fact that defendant has two children, for whom he is not the primary caregiver.

Defendant argues that consecutive sentencing on these charges is tantamount to finding that he had the requisite state of mind for purposeful or knowing murder under N.J.S.A. 2C:11-3(a)(1), (2) because the trial judge remarked that defendant "had the objective[] of murdering Shakime Peppers." That comment was a prelude to the judge's discussion of the Yarbough factors, in which he explained:

> Applying those factors, the Court find that the objectives of murdering Shakime Peppers and robbing Radee Foye were predominately independent of one another. Defendant took property from Radee Foy but not - - did not even attempt to do so after having shot and killed Shakime Peppers. There are multiple victims in this case. The acts of violence; that is, shooting Shakime Peppers is separate from the threat of violence against Radee Foye. While the crimes were committed closely together and in the same place, to sentence defendant concurrently for the crime of robbery of Radee Foye and the murder of Shakime Peppers would be to give Defendant a free crime.

As noted by defendant, and admitted by the prosecution, it was not clear from the record who pulled the trigger of the gun that shot Peppers. There is a reasonable basis in the record to punish defendant with consecutive sentences for both the death of Peppers committed in the course of a felony, and the commission of at least one of the two robberies.

As the trial judge recognized, the crimes did begin together. However, Foye escaped, whereas Peppers was chased and shot. The violence escalated with Peppers as a second victim. It was appropriate to treat the robbery of Foye as distinct from the ensuing killing of Peppers. We thus affirm the consecutive sentences that were imposed, and on remand the Judgment of Conviction shall be corrected to reflect the sentence as handed down by the trial judge at the sentencing hearing to any extent it is inconsistent. See State v. Vasquez, 374

26

N.J. Super. 252, 270 (2005) ("A trial court's oral opinion normally controls over an inconsistent judgment of conviction.").

Defendant lastly argues in his supplemental brief that the case should be remanded for application of the mitigating factor of youth to be considered in sentencing as espoused in L. 2020, c. 110 (eff. Oct. 19, 2020), which amended N.J.S.A. 2C:44-1(b) by adding the defendant's youth (i.e., less than twenty-six years of age) to the mitigating sentencing factors. Our case law has rejected the claim that this statute applies retroactively in the absence of an independent basis to remand a sentence, see State v. Tormasi, 466 N.J. Super. 51, 67 (App. Div. 2021). Since we are only remanding the matter to remove the inadvertent consecutive term on Count 5, the trial court is not authorized to consider the new "youth factor" when it carries out that ministerial correction.

Affirmed in part, and remanded in part to correct the sentence on Count 5 as explained in this opinion.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION